UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CASTEL

ABHA INTERNATIONAL, LLC                 :

        *PLAINTIFF,*                          :

VS.                                     :

CLOVER INTERNATIONAL                    :
CORPORATION, STOYAN I. BAKALOV,         :
AND CROWN INTERNATIONAL                 :
INCORPORATED                            :
                                        :
        *DEFENDANTS.*                        :



11 CIV 6841

CASE NO.

## COMPLAINT TO COMPEL ARBITRATION

Plaintiff ABHA International, LLC ("Plaintiff" or "ABHA"), subject to ABHA's rights in arbitration, files this its Complaint to Compel Arbitration against Clover International Corporation ("Clover"), Stoyan I. Bakalov ("Bakalov"), and Crown International Incorporated ("Crown"), and alleges as follows:

### THE PARTIES

1.     Plaintiff ABHA is a registered Massachusetts limited liability company (LLC) with its principal place of business in Boston, Massachusetts. All pleadings may be served on ABHA through its counsel, Gary Ireland, Law Office of Gary E. Ireland, 530 Fifth Avenue, 23rd Floor, New York, New York 10036.

2.     Defendant Clover is a Virginia corporation with its principal place of business at 8508 Virginia Meadows Drive, Manassas, Virginia. Clover may be served with process by and through its registered agent for service of process, Stoyan I. Bakalov, 8508 Virginia Meadows Drive, Manassas, Virginia 20109.

1

3.    Defendant Crown is a Virginia corporation with its principal place of business at 8508 Virginia Meadows Drive, Manassas, Virginia.  Crown may be served with process by and through its registered agent for service of process, Stoyan I. Bakalov, 8508 Virginia Meadows Drive, Manassas, Virginia 20109.

4.    Defendant Stoyan I. Bakalov is an individual who resides in Virginia.  Bakalov may be served with process at his place of business, 8508 Virginia Meadows Drive, Manassas, Virginia 20109.

## JURISDICTION, VENUE, AND CHOICE OF LAW

5.    Plaintiff seeks an order compelling Clover to arbitrate Plaintiffs' claims against Clover pursuant to agreements between the parties, including the Consulting and Representation Agreement ("Consulting Agreement") and the Non-Circumvention, Non-Disclosure & Working Agreement ("Working Agreement").  Copies of the Consulting Agreement and the Working Agreement are attached to the Complaint, and incorporated herein by reference, as Exhibit "A" and Exhibit "B", respectively.   ABHA and Clover agreed under the Consulting Agreement that "[a]ll claims for arbitration shall be properly submitted to the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York." (Exhibit "A", p. 3, ¶ 5.02). ABHA and Clover agreed under the Working Agreement to resolve all disputes by arbitration and to "[j]urisdiction of the State of New York, USA and the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York." (Exhibit "B", p. 2).

7.    Plaintiff seeks to compel Bakalov and Crown to answer in arbitration for the claims Plaintiff has against Clover and others pursuant to 9 U.S.C. § 4 and 9 U.S.C. § 206. Plaintiff also seeks to compel arbitration with those parties who may be liable as the alter egos of Clover.

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the suit involves a controversy between parties of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 9 U.S.C. § 1, *et seq.*, and 9 U.S.C. § 201, *et seq.*

9.    Venue is proper in this Court pursuant to the Consulting Agreement and the Working Agreement.  Pursuant to the Consulting Agreement, ABHA and Clover agreed that jurisdiction of disputes under the Consulting Agreement would be in "the State of New York, USA and the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York," and that all claims for arbitration would be "submitted to the Federal courts situated in the Borough of Manhattan, City of New York, State of New York." (Exhibit "A", p. 5, ¶ 5.02).  The Working Agreement provides for "[j]urisidction of the State of New York, USA and the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York."  (Exhibit "B", p. 2).  The Working Agreement further provides that the signing parties accepted the selected jurisdiction "as the exclusive venue." (Exhibit "B", p. 2).

10.    The Court has personal jurisdiction over the defendants pursuant to the Consulting Agreement and the Working Agreement between the parties. Clover consented to jurisdiction in New York for actions arising under the Consulting Agreement and the Working Agreement or out of subject matter relating to the agreements.  ABHA and Clover agreed that jurisdiction of disputes under the Consulting Agreement would be in "the State of New York, USA and the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York," and that all claims for arbitration would be "submitted to the Federal courts situated in the Borough of Manhattan, City of New York, State of New York."  ABHA and Clover agreed in the Working Agreement that jurisdiction would be in the "State of New York, USA and the

Federal Courts situated in the Borough of Manhattan, City of New York, State of New York . . .

." (Exhibit "B", p. 2).

11.    The parties agreed that the Consulting and Representation Agreement would be interpreted and enforced in accordance with the laws of the State of New York as to contracts made, entered into and performed therein.

FACTUAL BACKGROUND

12.    ABHA is a company experienced in international project management which has established valuable and politically recognized relationships in Egypt and other countries in the region.  ABHA, and its Egyptian agent, Matsico Trading & Finance Co. ("Matsico"), have more than 50 years combined experience in Egyptian business activities.  Such experience and relationships allow ABHA to act as a seller's representative for establishing coal sales markets in the region and in procuring contracts for the sale of "CIC metallurgical coal" to the steel industry in Egypt and other countries in the region.

13.    ABHA had worked for years to initiate and establish exclusive and direct representation with Al Nasr Co. for Coke and Chemicals ("Al Nasr").  Al Nasr is a company owned and controlled by the Egyptian government which is responsible for the strategic supply of coke to the Egyptian steel industry and exports of finished coke for trade balance.

14.    Clover and Bakalov represented that Clover was an established U.S. corporation with over 22 years experience in international coal sales and distribution.  Clover and Bakalov further represented to ABHA that Clover had the capability and the desire to sell coal, load it on a vessel at a U.S. port, and deliver it to interested foreign buyers.  In its marketing materials, which Clover and Bakalov provided to ABHA, Clover stated that it was a global supplier of high quality metallurgical coal, steam coal, iron ore, and liquid fuels with a worldwide network of

4

affiliates and independent agents devoted to fulfilling customers' requirements. Clover stated that it had operational contacts in most coal producing regions in the Eastern United States that would enable Clover to deliver a customer's coal or other fuel efficiently and reliably to its final point of destination. Clover represented that it had multiple offices extending as far as Eastern Europe, that the company had proven reliability and commitment to its customers, and that Clover had attained the enviable position of quick response in delivery while operating under strict restraints of time. Clover also represented implicitly and explicitly that it had the financial resources and ability to perform the orders sought with Al Nasr and satisfy the conditions imposed by Al Nasr.

15.    On May 9, 2005, ABHA and Clover executed the Working Agreement which stated that ABHA and Clover wished "to enter into [the] Agreement, **for the sale and purchase of COKING COAL**, to define certain parameters of the future legal obligations, are bound by a duty of Confidentiality with respect to their sources and contacts."    (Exhibit "B", p. 1) (Emphasis in original).    ABHA entered into the Working Agreement because of Clover and Bakalov's repeated representations and assurances that Clover was an established and experienced supplier and that Clover could supply coal to international customers in an efficient and timely manner.

16.    In the Working Agreement, ABHA and Clover agreed that the parties would not solicit or accept any business in any manner related to any buyer and/or its affiliates and their agents and the seller and/or its affiliates and their agents for the sale of coking coal within the country of Egypt except through the parties signing the Working Agreement. The "duration of the [Working] Agreement" was five (5) years from the date of the agreement, May 9, 2005.    In other words, the Working Agreement established that Clover was to be the exclusive supplier for

any coal sales or supply contracts that ABHA initiated in Egypt during the term of the Working Agreement which expired on May 10, 2010.

17.     Over the next four years, ABHA pursued opportunities in Egypt for Clover, including efforts to capture the valuable coal supply business with Al Nasr.  Under the provisions of the Working Agreement, ABHA could only pursue such opportunities for Clover.  To procure contracts for Clover with Al Nasr, ABHA had to persuade the government-controlled company to replace an existing and successful supplier and to allow Clover an opportunity to supply Al Nasr's demands.  Based on ABHA and Matsico's relationships and contacts in Egypt, ABHA was confident that once Al Nasr awarded an initial coal supply contract to Clover, ABHA would be successful in placing Clover as a long-term supplier to Al Nasr.

18.     On July 10, 2009, ABHA and Clover executed the Consulting Agreement in which Clover engaged ABHA as a consultant and general representative for establishing coal sales markets in Egypt "where ABHA has exclusively initiated direct representation with Al Nasr. . . ." (Exhibit "A").  Under the terms of the Consulting Agreement, Clover retained ABHA to act as Clover's sales representative, to provide consulting, legal and political support, and to use ABHA's contacts and relationships to initiate and procure coal sales and supply contracts for Clover with Al Nasr.  (Exhibit "A", ¶¶ 1.01- 1.03).

19.     The Consulting Agreement provided that if ABHA initiated a sale of coal from Clover to Al Nasr, and if the sale was established at the FOBT (free on board and trimmed) price of $139.00 per metric ton, Clover agreed to compensate ABHA for its services in the amount of $3.00 (USD) for every metric ton of coking coal paid for by Al Nasr.  If the sale was established at the FOBT price of $137.00 per metric ton, ABHA was to be paid $2.00 (USD) for every metric ton of coking coal paid for by Al Nasr.  (Exhibit "A", ¶ 2.01).

20.    Clover and Bakalov repeatedly represented to ABHA that Clover would be able to supply and deliver all coking coal requested by Al Nasr, or any other foreign buyer, and that Clover would comply with all other terms and conditions of Al Nasr's public tender, including, but not limited to, providing a performance guarantee or performance bond.

21.    On July 17, 2009, Al Nasr notified ABHA that Al Nasr was issuing Public Tender 3/2009 which sought a supplier or producer from the United States, Australia, or Canada for 420,000 metric tons +/- ten percent (10%) of medium volatile coking coal on six shipments each of 70,000 metric tons +/- ten percent (10%) to be delivered during the period from September – December 2009.  Al Nasr stated that it was permissible to offer fewer shipments in response to the tender.  Al Nasr asked ABHA to submit a detailed offer in response to the public tender. ABHA immediately notified Clover that Al Nasr had announced that it was soliciting bids for a coal supply contract and inquired whether Clover was interested in submitting a bid for the contract.

22.    Al Nasr's public tender specifically provided that the successful offeror had to furnish a performance guaranty fully protecting Al Nasr against any direct loss incurred by Al Nasr as a result of any failure of the successful offeror to perform any of its duties.    The guaranty had to be satisfactory to Al Nasr and be in the form of an unconditioned, irrevocable, divisible and confirmed letter of guarantee in the amount of five percent (5%) of the total amount of the contracted value.

23.    On July 28, 2009, Clover presented a bid to Al Nasr for Public Tender 3/2009 for metallurgical medium volatile coking coal with the assistance of ABHA and Matsico.  Clover's bid stated that the bid was issued according to the terms and conditions stated in Public Tender 3/2009 and that the performance guaranty would follow according to the tender's terms and

based on future mutual agreement.    In its bid, Clover offered the Port of Mobile, Alabama, as the loading port, and agreed to the loading dates requested in the Public Tender.

24.    All companies in the coal industry are aware of the maintenance schedule for locks and rivers which are frequently used to transport product for loading and shipping.  Any maintenance plans for a particular shipping area are announced months, if not years, in advance.

25.    During the bidding process, Bakalov represented to ABHA once again that he was committed to attaining the coal supply contracts with Al Nasr.  On July 29, 2009, Bakalov represented that he would provide the lowest price by arranging with cooperating mines in which he had a partial ownership interest or in which he was a former member of the board.  Bakalov further represented that Clover had the experience and connections within the coal industry to source, transport, and blend the product, and deliver the coal to the required terminal.  Clover and Bakalov were aware of the public tender's requirements, including product quality and required delivery dates.

26.    During the bidding process, Al Nasr repeatedly requested information regarding Clover's ability to issue the required bid bond and performance bond and the metallurgical qualities of the coke which would be supplied by Clover.  Al Nasr requested that Clover issue the bid bond, or at least, provide some evidence that Clover would and could comply with that requirement.    In response to Al Nasr's questions and concerns, Clover stated that the "Performance Guaranty will follow according to the Tender terms and based on future mutual agreement."  Bakalov also informed ABHA and Al Nasr that it would take at least 30 days to have a bond issued through his insurance company.  As an alternative, Bakalov suggested that his bank, TD Bank, N.A., issue a stand-by letter of credit.  Bakalov stated that Crown, "one of our main companies," would be receiving funding for overseas pending projects.  After the funds

had been confirmed to Crown's account, Crown would receive approval to "land [sic] the necessary funds to Clover International for the purpose of issuing of [sic] stand-by letter of credit." Clover assured Al Nasr in writing, as well as ABHA, that Clover had engaged its bank to establish a cash-based letter of credit and the procurement of a bid bond, and ultimately, the performance bond, through its bank, TD Bank, N.A.

27.    ABHA successfully procured the sales contract with Al Nasr for the supply of coking coal pursuant to Al Nasr's Public Tender 3/2009 for Clover.    On August 25, 2009, Al Nasr sent Clover written notice that Clover had been awarded the contract for two firm cargoes of coking coal to be delivered in October and December 2009 and one additional cargo to be declared after delivery of the first two firm cargos. In its notice, Al Nasr stated that the High Committee of Purchasing Coal had decided to award Clover the contract under Al Nasr's public tender.    The award stated that each cargo was to contain 70,000 metric tons +/- ten percent (10%) of medium volatile coking coal at the typical specification referenced in Clover's offer. Pursuant to the award, Clover was to deliver the two cargoes of coking coal for loading in October and December 2009, and the "exact loading laycan" was to be agreed upon between the parties. The price for the coking coal was $137.00 (USD) FOBT loading Port Mobile, Alabama. Al Nasr informed ABHA and Matsico that Clover would receive additional contracts and orders if Clover fulfilled the awarded supply contract in a timely and proper manner.

28.    An express term of Al Nasr's award of the supply contract was that Clover was to provide a performance guaranty or performance bond for five percent (5%) of the total amount of awarded quantity valid for 60 days after completion of the awarded cargoes. The performance guaranty was to be endorsed by a first class bank in Cairo, Egypt.  Al Nasr's award notice also incorporated by reference the conditions set forth in Al Nasr's Public Tender 3/2009 for the

supply of the coking coal, including the requirement of a performance guaranty fully protecting Al Nasr against any direct loss incurred by Al Nasr as a result of any failure of the successful offeror to perform any of its duties.

29.    On August 26, 2009, Clover confirmed in writing that Clover accepted the tender award for delivery of the 140,000 MT +/- of coal to be followed by additional 70,000 MT +/- per Al Nasr's option.   Al Nasr "stamped" the award letter, meaning that the award letter was now a binding document in Egypt.   Clover prepared a coal supply agreement which Al Nasr revised and then accepted.   The U.S. Embassy in Cairo, Egypt, informed the parties that the award letter had been sent to the Embassy as evidence of an official award by the Egyptian government.

30.    Shortly after Al Nasr awarded the contract to Clover, Clover notified ABHA that it had not yet been able to obtain the requisite performance bond despite its knowledge that the performance bond was an essential term of the supply contract and despite its representations that it could and would provide the bond.   Over the next few months, Clover and Bakalov assured ABHA, as well as Al Nasr, that Clover and Bakalov were still working to get a performance bond issued or trying to come up with a suitable alternative to the performance bond.   Al Nasr informed ABHA and Matsico that the other U.S. suppliers who were participating in the tender had already provided the required performance bond, and that Al Nasr did not understand why Clover could not easily comply with that requirement.   Based on its contacts and relationships with Al Nasr, ABHA was able to persuade Al Nasr to provide Clover additional time to obtain the performance bond.

31.    Just days after Clover accepted the Award, Clover notified Al Nasr and ABHA that due to extreme congestion of the Port of Mobile, Alabama, the port would not be able to handle Clover's coal cargo for the first shipment.   The original and agreed laycan for the first

cargo was October 1-10, 2009. Clover stated that it had made arrangements to load the first vessel from the Port of Lambert Point, Norfolk, Virginia, with tentative laycan of October 15-19, 2009. Clover also confirmed that arrangements for the issuance of the performance bond were started with TD Bank, N.A.

32.    After ABHA and Matsico once again intervened with Al Nasr on behalf of Clover, Al Nasr agreed reluctantly to the change in location and shipping dates although Al Nasr had been making freight arrangements based on Clover's original bid locations and shipping dates. ABHA informed Clover that even if the dates changed, Clover could address Al Nasr's concerns about Clover's ability to perform under the supply contract if Clover would obtain the performance bond. Al Nasr accepted Clover's request, but Al Nasr informed Clover that the quality of the coal must have the same specifications without any change and that the laycan would need to be changed to October 10-20, 2009, to avoid scheduling issues with two other coal cargos that were to be loaded from Norfolk during that period.

33.    After Al Nasr had agreed to push back the loading dates, Clover requested a second change in the laycan for the first shipment.    Clover stated that due to unforeseen circumstances, the laycan for the first shipment would be delayed until October 25 – November 5, 2009. Al Nasr informed Clover that Al Nasr had already agreed to the first delay, and that it had awarded the freight contract to a company based on the revised shipping schedule. Al Nasr stated that if Al Nasr agreed to Clover's new request, Al Nasr would have to obtain the approval of the shipping company and its agent and that any additional freight costs would be charged to Clover. ABHA persuaded Al Nasr to work with Clover, and Al Nasr agreed to do its best to make arrangements that would comply with Clover's new date requirements. However, ABHA informed Clover that it was imperative that the new dates be fixed, not tentative, and that the

11

performance bond should be issued. Clover responded that Clover would have a "tentative laycan" between October 25 and November 5-10, 2009.

34.    Throughout September and October 2009, Al Nasr continued to request that Clover provide firm shipment dates and provide the required performance bond. Clover continued to provide a series of excuses as to why it could not obtain the required performance bond. Clover stated that it should not be required to provide a performance bond until the final agreement had been signed by Al Nasr and Al Nasr had issued a letter of credit for payment, even though the award letter was a binding document under Egyptian law and the performance bond was a required term of the original public tender.

35.    Based on Clover's continued reluctance to issue the required performance bond, which should have been fairly straightforward process, and Clover's repeated requests for delays, ABHA, Matsico, as well as Al Nasr, realized that Clover did not have, and could not obtain, the coal which was the subject of the contract. Clover's actions and omissions show that Clover never intended to issue or provide the required performance guarantee bond. Clover was very much aware that the provision of the guarantee or bond to Al Nasr would be a requirement of any supply contract with Al Nasr.

36.    Despite its repeated representations to the contrary, Clover did not have the financial resources or the capability to obtain the performance bond or a stand-by letter of credit and to acquire the coal for shipment. Al Nasr showed its willingness to cooperate with Clover by delaying shipment dates, deferring the performance bond, and agreeing to go without a bid bond. Al Nasr eventually cancelled its award to Clover, effectively blacklisting Clover from any further supply opportunities in Egypt. Likewise, ABHA has lost an opportunity to build

what would have been a long term supply relationship with Al Nasr, and ABHA's reputation and relationship with Al Nasr have been irrevocably damaged.

## REQUEST FOR ORDER COMPELLING ARBITRATION

37.     Plaintiff repeats the foregoing paragraphs 1 through 36 as if fully set forth in full herein.

38.     Plaintiff seeks an order compelling Clover to arbitrate Plaintiffs' claims against Clover pursuant to agreements between the parties, including the Consulting Agreement and the Working Agreement.     Plaintiffs' claims against Clover are described below, at least in part. Plaintiffs seek an order compelling Clover to arbitrate any and all claims among the parties that relate to the Consulting Agreement and Working Agreement, and all claims that arise out of the parties' business relationship for the procurement of coal supply contracts.

## BREACH OF CONTRACT – THE CONSULTING AGREEMENT

39.     Plaintiff repeats the foregoing paragraphs 1 through 38 as if fully set forth in full herein.

40.     The Consulting Agreement is a binding contract between ABHA and Clover, supported by valid consideration.

41.     ABHA fully performed under the Consulting Agreement.

42.     Under the Consulting Agreement, Clover was obligated to compensate ABHA for its consultant and representative services if ABHA initiated a sale of coal from Clover to Al Nasr.     Under the Consulting Agreement, if the price was established at the FOBT price of $137.00 per metric ton, ABHA was to be paid $2.00 (USD) for every metric ton of coking coal to be paid for by Al Nasr.  In this case, the agreed upon price was $137.00, and therefore, ABHA was entitled to a commission of $420,000.

43.    Clover breached the Consulting Agreement by failing to compensate ABHA for its work in obtaining Al Nasr as a customer for Clover and for procuring the coal supply contract for two firm cargos of coking coal to be delivered in October and December 2009 and one additional cargo to be declared after delivery of the first two cargos.

44.    ABHA has sustained damages as a result of Clover's breach of the Consulting Agreement with ABHA, including lost commissions of $420,000 and lost commissions from future business with Al Nasr in an amount to be determined at trial, but which would be in excess of $3 million.

## BREACH OF CONTRACT – THE WORKING AGREEMENT

45.    Plaintiff repeats the foregoing paragraphs 1 through 44 as if fully set forth in full herein.

46.    The Working Agreement is a binding contract between ABHA and Clover, supported by valid consideration.

47.    ABHA fully performed under the Working Agreement.

48.    Under the Working Agreement, ABHA agreed to act as Clover's exclusive agent in the solicitation of contracts for the sale of coking coal within the country of Egypt.  Clover was obligated to compensate ABHA if ABHA was able to procure coal supply contracts for Clover in Egypt.

49.    Clover breached the Working Agreement by failing to compensate ABHA for its work in obtaining Al Nasr as a customer for Clover and for procuring the coal supply contract for two firm cargos of coking coal to be delivered in October and December 2009 and one additional cargo to be declared after delivery of the first two cargos.

14

50.    ABHA has sustained damages as a result of Clover's breaches of the Working Agreement.  As provided in the Working Agreement, ABHA is entitled to "a legal monetary penalty equal to the maximum service it should have realized from such a transaction plus any and all expenses, including but not limited to all legal costs and expenses incurred to recover the lost revenue."    ABHA is entitled to recover its damages, including lost commissions of $420,000 and lost commissions from future business with Al Nasr in an amount to be determined at trial, but which would be in excess of $3 million, and its attorney's fees and costs.

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

51.    Plaintiff repeats the foregoing paragraphs 1 through 51 as if fully set forth in full herein.

52.    The Working Agreement and Consulting Agreement are binding contracts between ABHA and Clover, supported by valid consideration.

53.    The Working Agreement and the Consulting Agreement imply a covenant of good faith and fair dealing in the course of performance," which "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *See 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N. Y. 2002) (internal quotation marks omitted).  Under this duty, Clover was obliged not to do anything that would result in destroying or injuring the right of ABHA to receive the benefits of the contract.

54.    Implicit in both agreements is a duty of good faith and fair dealing, requiring Clover, among other things, to act in good faith in its dealings with ABHA as ABHA worked to procure a coal supply contract for Clover in Egypt and in particular with Al Nasr; to act in good faith in the preparation and submission of its bid to Al Nasr; to act in good faith with ABHA

during the bidding process and after the award of the supply contract; and to act in good faith in its compliance with Al Nasr's requirements under the public tender.

55.    Clover breached its duty of good faith and fair dealing by failing to provide the required performance bond, despite the fact that the performance bond or guaranty was a specific contractual requirement of Public Tender 3/2009; by using dilatory tactics to drag the negotiations with Al Nasr out over a long period of time, all in an effort to circumvent its contractual obligations to Al Nasr, and therefore, ultimately to ABHA; by repeatedly representing that it was in the process of procuring the required performance bond when it later became clear that Clover was intentionally and deliberately delaying the process and had not taken even the initial steps to procure the bond; by repeatedly requesting that Al Nasr agree to new "tentative" laycan dates because of purported maintenance issues with and/or closing of the locks, rivers and waterways at the ports despite the fact that such issues had been publicized well in advance of Al Nasr's Public Tender 3/2009 and before submission of Clover's bid and offer to Al Nasr; by representing that Clover had the capability and desire to sell coal, load the coal on a vessel at a U.S. port and deliver it to interested foreign buyers; by representing that Clover was a global supplier of high quality metallurgical coal with a worldwide network of affiliates and agents devoted to fulfilling customers' requirements; by representing that Clover had the financial capability of providing any required performance bond or guaranty; by representing that Clover would be able to supply and deliver all coking coal requested by Al Nasr or any other foreign buyer; by representing that Clover would comply with all terms and conditions of Al Nasr's public tender; and by representing that Clover was interested in pursuing and establishing a valuable long-term supplier relationship with Al Nasr which would financially benefit both Clover and ABHA.

56.    Clover's breaches of good faith and fair dealing have caused ABHA to suffer damages in an amount to be determined at trial, including, but not limited to, ABHA's lost commissions from future shipments to Al Nasr under extended contracts.

## FRAUD

57.    Plaintiff repeats the foregoing paragraphs 1 through 56 as if fully set forth in full herein.

58.    Clover and Bakalov made material misrepresentations to ABHA regarding Clover's performance and ability as a coal supplier and its financial capability to comply with the requirements of any public tender.  Such material misrepresentations included statements and representations by Clover and Bakalov that Clover was in the process of procuring the required performance bond when it later became clear that Clover was intentionally and deliberately delaying the process and had not taken sufficient steps to procure the bond; that the company had the capability and desire to sell coal, load the coal on a vessel at a U.S. port and deliver it to interested foreign buyers; that Clover was a global supplier of high quality metallurgical coal with a worldwide network of affiliates and agent devoted to fulfilling customers' requirements; that Clover had the financial capability of providing any required performance bond or guaranty; that Clover would be able to supply and deliver all coking coal requested by Al Nasr or any other foreign buyer;  that Clover would comply with all terms and conditions of any proposal or public tender;  that Clover and Bakalov were interested in pursuing and establishing a valuable long-term supplier relationship with Al Nasr which would financially benefit both Clover and ABHA.

59.    Such statements and representations were false; Clover and Bakalov knew or should have known such representations and promises were false when made; such representations were made with knowledge of their falsity or made recklessly without any

17

knowledge of the truth.  Clover and Bakalov made such representations and promises with the intention that they should be acted on by ABHA, and Clover and Bakalov intended to defraud ABHA.

60.     ABHA justifiably relied on Clover and Bakalov's representations and promises and thereby suffered injury and damages.

### ALTER EGO AND PIERCING THE CORPORATE VEIL

61.     Plaintiff repeats the foregoing paragraphs 1 through 60 as if fully set forth in full herein.

62.     Clover is merely a captive corporation through which Bakalov and Crown entered into the Consulting and Representation Agreement as the alter egos of Clover.

63.     Bakalov and Crown dominate and disregard Clover's corporate form to the extent that Clover had and has no business and operations that were not Crown's and has thereby hindered, delayed and defrauded Plaintiff in breach of the Consulting Agreement and the Working Agreement.

63.     On information and belief, Clover does not have any dedicated employees separate from Crown and is operated out of the offices of Crown and under the "umbrella" of Crown.

64.     Clover is beneficially owned, controlled, and dominated by Bakalov and/or Crown.

65.     At all material times, Clover and Crown are alter egos of one another.

66.     On information and belief, Bakalov and/or Crown owns and/or controls the shares of Clover.

18

67.    On information and belief, Clover is a captive corporation through which Bakalov and/or Crown represented that they would supply coal under the Consulting and Representation Agreement, and which is now without assets, in order to hinder, delay, and defraud Plaintiff.

68.    On information and belief, Clover, Crown, and Bakalov disregarded corporate formalities; Clover was inadequately capitalized; intermingled its funds, was dominated by Crown and/or Bakalov; did not deal with Crown and/or Bakalov at arm's length; and was not treated as an independent profit center and has intermingled property; and has shared officers, offices (if any), and employees.

69.    In summary and in connection with Plaintiff's alter ego and/or single business enterprise allegations with respect to Crown and Bakalov, there is ample evidence before this Court that Crown and/or Bakalov have created a web of companies, including Clover, all of which are its alter egos and have conspired to hinder, delay, and defraud Plaintiff and intend to prevent any recovery for breach of the Consulting and Representation Agreement.

### REQUEST FOR ORDER COMPELLING CROWN AND BAKALOV TO ARBITRATE

70.    Plaintiff repeats the foregoing paragraphs 1 through 69 as if fully set forth in full herein.

71.    Pursuant to 9 U.S.C. § 4 and 9 U.S.C. §206, Plaintiff seeks an order directing Crown and Bakalov to arbitrate Plaintiff's claims under the Consulting  Agreement and the Working Agreement as alter egos of Clover as well as its alter ego claims against these defendants.

### PRAYER

WHEREFORE, Plaintiff ABHA International Corporation, LLC, prays that the Court grant the following relief against these Defendants:

A.     That process in due form of law issue against Defendants, citing them to appear and answer under oath all and singular the matter alleged in the Complaint to Compel Arbitration;

B.     That this Court enter an order compelling Defendant Clover Coal Corporation to arbitrate Plaintiff ABHA International Corporation, LLC's claims against Clover Coal Corporation pursuant to the parties' agreements;

C.     That this Court enter an order compelling Defendant Crown International Incorporated and Defendant Stoyan I. Bakalov to arbitrate Plaintiff's alter ego claims;

D.     That this Court retain jurisdiction over this matter to recognize and enforce an arbitration award under the Consulting and Representation Agreement  and the Non-Circumvention, Non-Disclosure & Working Agreement, jointly and severally, pursuant to 9 U.S.C. § 1, *et seq.* and 9 U.S.C. § 201, *et seq.*; and

E.     That the Court award Plaintiff ABHA International Corporation, LLC, further and additional relief as may be just and proper.


Dated:  September 26, 2011

LAW OFFICES OF GARY E. IRELAND


BY: _____

Gary E. Ireland (GEI 5712)
530 Fifth Avenue, 23rd Floor
New York, New York 10036-5101
Tel: (212) 991-5468
Fax: (212) 944-7630
Counsel for Plaintiff

Co-Counsel

David K. Anderson (DKA 8534)
SBT No. 01174100
SDT No. 7405
1221 Lamar, Suite 1115
Houston, Texas 77010
Tel: 713-655-8400
Fax: 713-650-0260

**EXHIBIT A**

FROM :CLOVER INTERNATIONAL--        FAX NO. :7033687543        Oct. 10 2009 02:37PM  P12

## CONSULTING AND REPRESENTATION AGREEMENT
### CIC/ABHA/-001/09-1

This Agreement made on the 10th day of July 2009, by and between **CLOVER INTERNATIONAL CORPORATION**, having its headquarters at 8508 Virginia Meadows Drive, Manassas, Virginia, 20109-4861, USA, represented by its Chairman and President, Dr. Stoyan I. Bakalov (hereinafter called **"CIC"**) and **ABHA INTERNATIONAL**, PO BOX 1391, Attleboro Falls, Boston, MA 02763, USA (hereinafter called **"ABHA"**), represented by its President, Mr. Paul F. Karshis.

### WITNESSETH

**WHEREAS**, CIC is an established U.S. corporation, with over 22 years experience in international coal sales and distribution; and,

**WHEREAS**, CIC has the capability and desire to sell coal, load it in to a Vessel at a U.S. Port and deliver it to interested foreign Buyers; and,

**WHEREAS**, ABHA is an established U.S. company, experienced in international project management and in country representation, politically recognized within the country of Egypt and other countries in that region, able and ready to arrange for the representation of CIC metallurgical coal sales in to the Steel Industry sectors of such countries

**NOW, THEREFORE,** The parties hereto, for and in consideration of the mutual promises each to the other and for consideration of the premises and under the terms and conditions set forth in this Agreement agree as follows:

## SECTION 1. AGREEMENT OUTLINE

**1.01**  CIC hereby agrees to engage ABHA as Consultant and General Representative for establishing coal sales markets within the country of Egypt where ABHA has exclusively initiated direct representation with Al Nasr Co. for Coke and Chemicals.

**1.02**  As engaged by CIC for coal sales initiation, consulting, legal and political support per orders of CIC, ABHA shall perform its obligations as follows:

a.    Strictly follow CIC requests and act only through its authorization letters in compliance of all applicable laws and regulations within the countries where his services are needed and being engaged for coal sales approved by CIC.

b.    ABHA shall devote such amount of its productive time ability and attention to the services requested by CIC, as such specific needs will require in the sole discretion of ABHA for the fulfillment of its obligations to CIC.



    c.    As CIC engages ABHA as consultant and initiator for CIC coal sales, ABHA shall maintain professional business relation with high standards of integrity, loyalty, and honesty.

    d.    ABHA shall be responsible for all of its own expenses, including but not limited to travel, transportation, hotels, restaurant, and other accommodations incurred in connection with the business as ordered by CIC per this Section.

**1.03**  As CIC engages ABHA for the services stated in Section 1.02 and when such coal sales and supply have been awarded to CIC and deliveries have started on a long-term basis, ABHA shall be responsible for the following:

    a.    Maintain friendly and courteous business relationship with the Buyer;

    b.    Resolve any arising political disputes directly effecting the fulfillment of supply obligation of CIC within the Country of Egypt and protect CIC interests in any authorized negotiations;

    c.    Respond in a timely matter when CIC requests the organizing of an emergency meeting with the personnel directly responsible for receiving coal deliveries in the country of Egypt.

    d.    ABHA shall be responsible for all expenses, including but not limited to travel, transportation, hotels, restaurant, and other accommodations incurred in connection with the business as ordered by CIC per this Section.

## SECTION 2. COMPENSATION

**2.01**  As engaged by CIC for coal sales initiation, consulting, legal and political support per orders of CIC, ABHA shall be entitled to the following compensation:

    a.    When any CIC coal sales initiated by ABHA to El Nasr Co. for Coke and Chemicals have been established at the FOBT price of $139.00 per metric ton and payment for such coal has been executed and received in the account of CIC, ABHA shall be paid for its services by direct wire transfer or by other means accepted by both parties, the amount of **$3.00 (three USD)** for every metric ton of coking coal paid for by the Buyer. The payment to ABHA shall be effected within 5 days after disbursement of funds to CIC.

    b.    When any CIC coal sales initiated by ABHA to El Nasr Co. for Coke and Chemicals have been established at the FOBT price of $137.00 per metric ton and payment for such coal has been executed and received in the account of CIC, ABHA shall be paid for its services by direct wire transfer or by other means accepted by both parties, the amount of **$2.00 (two USD)** for every metric ton of coking coal paid for by the Buyer. The payment to ABHA shall be effected within 5 days after disbursement of funds to CIC.

*CONSULTING AND REPRESENTATION AGREEMENT # CIC/ABHA/001/09-1, Page 2 of 3 Pages*

## SECTION 3. PARTIES PARTICIPATION

**3.01**  It is hereby understood that CIC is an independent contractor having association by this Agreement with ABHA for the purpose of successful distribution and sale of metallurgical coal from the US. Thus, CIC is not in partnership, joint venture, nor agency for ABHA together or in part. No other special relationship other than independent contractor for the purposes stated herein is intended.

## SECTION 4. TERM

**4.01**  This Agreement shall have an effective date the 10th of July 2009 and shall continue for the full term of any engaged Coal Sales Agreements as outlined in Section 1 and Section 2 of this Agreement.

**4.02**  The term of this Agreement may be extended per mutual satisfaction of the parties by execution of an Addendum.

## SECTION 5. GOVERNING LAW:

**5.01**  When performing services as engaged by CIC, ABHA hereby agrees to comply with all applicable laws and regulations of the United States and the countries where such services are provided; where by such confirmation for full compliance is strictly observed by ABHA for specific application of the United States Foreign Corrupt Practices Act.

**5.02**  This Agreement shall be construed, interpreted and enforced in accordance with the Laws of the State of New York, USA as to contracts made, entered into and performed therein, Jurisdiction of the State of New York, USA and the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York, and to service and process by registered mail. All claims for arbitration shall be properly submitted to the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York.

## SECTION 6. FORCE MAJEURE

**6.01**  If, because of force majeure, either party is unable to carry out any of its obligations under this Agreement either in whole or in part and if such party promptly gives to the other written notice of such force majeure, then the obligations of the party giving such notice shall be excused to the extent made necessary by such force majeure and during its continuance, provided the effect of such force majeure is eliminated by such party insofar as practicable with all reasonable dispatch.

**6.02**  Any deficiencies in performance caused by force majeure may be made up by mutual consent. The term "FORCE MAJEURE" shall include acts of God, war, riots, strikes, action of any Government or Government agency affecting performance, partial or complete embargo for trade, and other similar or dissimilar caused beyond the reasonable control of the party affected, foreseen or unforeseen.

## SECTION 7.  NOTIFICATION

**7.01**  All notifications and other advises required or foreseen by the present Agreement must be prepared in written form and considered to by duly mad if delivered to the Parties in person or by telefax / telex.

**7.02**  Any notifications or other advice delivered in person or by telex or telefax shall be as follows:

**To CIC:**              **Clover International Corporation**
                         **Attention: Dr. Stoyan I. Bakalov**
                         **8508 Virginia Meadows Drive**
                         **Manassas, Virginia 20109-4861, USA**
                         **Tel: 703-330-1200**
                         **Fax: 703-368-7543**
                         **Mobil: 703-459-7388**
                         **E-mail: cloverinter@aol.com**

**To ABHA:**             **ABHA International**
                         **Attention: Paul F. Karshis**
                         **P.O. Box 1391, Attleboro Falls**
                         **Boston, Massachusetts, 02763, USA**
                         **Tel: 508-699-2416**
                         **Fax: 508-643-4447**
                         **Mobile: 508-930-2124**
                         **E-mail: paul.karshis@abhausa.com**

## SECTION 8.  CONFIDENTIALITY:

**8.01**  All knowledge and /or information provided from CIC to the ABHA in connection to this Agreement, and any information which is designated as confidential at the time of disclosure, shall at all times and for all purposes be regarded as strictly confidential and held in trust solely for the benefit and use of the ABHA, as appropriate, and the same shall not disclose, directly or indirectly, any such knowledge or information to any other Person, without the prior written approval of CIC. Furthermore, the ABHA shall cause it's officers, employees, subcontractors, agents and or representatives take such reasonable action which may be necessary and /or advisable to preserve and protect the confidentiality of information obtained in connection with this Agreement. The restrictions of this Section shall not apply to:

          8.01(1) information when available from public sources at any time before or after it is disclosed to a party under this Agreement;

*CONSULTING AND REPRESENTATION AGREEMENT # CIC/ABHA/001/09-1; Page 4 of 5 Pages*

8.01(2) information obtained from a third party not associated with either party who had not acquired the information directly or indirectly from either party: and

8.01(3) information hereinafter disclosed by disclosing party to a third party without restriction on disclosure.

**8.02** Nothing in this Article shall prohibit CIC from disclosing such information to sublicenses or other Persons to whom the information may be transferred provided that CIC shall use it's best efforts to assure that such Persons agree to the provisions of confidentiality contained herein.

## SECTION 10. ENTIRE AGREEMENT:

**10.01** This Agreement contains the entire Contract between the parties with respect to the subject matter hereof and all proposals and representations with reference thereto are merged herein.

**10.02** No oral representations unless set forth in this Agreement will be binding between the parties.

**10.03** This Agreement has been made in two originals in English language.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their authorized officers as of the day and year first above written.

**For: Crown International Incorporated:**    **For: ABHA International**

.....................................        .....................................
Dr. Stoyan I. Bakalov                        Mr. Paul F. Karshis
President and Chairman                       President

SEAL

*CONSULTING AND REPRESENTATION AGREEMENT # CIC/ABHA/001/09-1, Page 5 of 5 Pages*

**EXHIBIT B**

## CLOVER-ABHA COKING COAL AGREEMENT

### CIC/ABH/004/05-1

## INTERNATIONAL CHAMBER OF COMMERCE (I.C.C.)
## NON-CIRCUMVENTION, NON-DISCLOSURE & WORKING AGREEMENT

This Agreement is made on the 9th day of May 2005, between Clover International Corporation located at 11430 Balls Ford Road, Manassas, Virginia 20109, USA and ABHA USA, located at 76 Blackberry Road, Boston, MA 02760, USA

WHEREAS, the Undersigned wish to enter into this Agreement, **for the sale and purchase of COKING COAL**, to define certain parameters of the future legal obligations, are bound by a duty of Confidentiality with respect to their sources and contacts.

WHEREAS, the Undersigned desire to enter a working business relationship to the mutual and common benefit of the parties hereto, including their affiliates, subsidiaries, stockholders, partners, co-ventures, trading partners, and other associated organizations (herein after referred to as "Affiliates").

NOW THEREFORE in consideration of the mutual promises, assertions and covenants herein and other good and valuable considerations, the receipts of which is acknowledged hereby, the parties hereby agree as follows:

TERMS AND CONDITIONS
The parties will not in any manner, solicit, nor accept any business in any manner related to any Buyer and/or its affiliates and their agents and the seller and/or its affiliates and their agents for the sale of coking coal within the country of Egypt except through the parties signing this agreement. The parties' will not in any manner solicit nor accept any business in any manner from the parties Affiliates. Exceptions can only be granted through the express permission of both parties and,

The parties will maintain complete confidentiality regarding each other business sources and/or their Affiliates and will disclose such business sources only to named parties pursuant to the express written permission of this party who made available the source; and,

That they will not in any of the transactions the parties are desirous of entering into and do, to the best of their abilities assure the other that the transaction codes established will not be affected and

That they will not disclose names, addresses, email address, telephone and fax or telex numbers to any contacts by either party to third parties and that they each recognize such contracts as the exclusive property of the respective parties and that they will not enter into any direct negotiations or transactions with such contracts as initiated by ABHA revealed by the other party and

That they further undertake not to enter into business transaction with banks, investors, sources of funds or other bodies, the names of which have been provided by one of the parties to this agreement, unless written permission has been obtained from the other party(ies) to do so. For the sake of this agreement, it does not matter whether information's obtained from a natural or a legal person.

Pg 1


EXHIBIT
B

## CLOVER-ABHA COKING COAL AGREEMENT

### CIC/ABH/004/05-1

## INTERNATIONAL CHAMBER OF COMMERCE (I.C.C.)
## NON-CIRCUMVENTION, NON-DISCLOSURE & WORKING AGREEMENT

The parties also undertake not to make use of a third party to circumvent this clause.

That in the event of circumvention of this Agreement by either party, directly or indirectly, the circumvented party shall be entitled to a legal monetary penalty equal to the maximum service it should realize from such a transaction plus any and all expenses, including but not limited to all legal costs and expenses incurred to recover the lost revenue.

All consideration, benefits, bonuses, participation fees and/or commissions received as a results of the contributions of the parties in the Agreement, relating to any and all transactions will be allocated as mutually agreed.

This Agreement shall be construed, interpreted and enforced in accordance with the Laws of the State of New York, USA as to contracts made, entered into and performed therein, Jurisdiction of the State of New York, USA and the Federal Courts situated in the Borough of Manhattan, City of New York, State of New York, as required by the Creditor, and to service and process by registered mail.

All claims for arbitration shall be properly submitted to the International Arbitration Association (IAA), City of New York, and State of New York, where by mutual agreement the parties hereto authorize the appointment of single arbitrator for resolution of disputes. The Contractor and Company further agree to be bound by any decision made by the IAA, which shall be accepted as final and not be a subject for appeals. The decision of IAA may be filed with the appropriate jurisdiction and enforced by the law of such jurisdiction.

The signing parties hereby accept such selected jurisdiction as the exclusive venue. The duration of the Agreement shall perpetuate for five (5) years from the date hereof.

AGREEMENT TO TERMS:
Signatures on this Agreement received by the way of Facsimile, Mail and/or Email shall be deemed to be an executed contract. Agreement enforceable and admissible for all purposes as may be necessary under the terms of the Agreement.
All signatories hereto acknowledge that they have read the foregoing Agreement and by their initials and signature that they have full and complete authority to execute the document for and in the name of the party for which they have given their signature.

**CLOVER-ABHA COKING COAL AGREEMENT**

**CIC/ABH/004/05-1**

INTERNATIONAL CHAMBER OF COMMERCE (I.C.C.)
NON-CIRCUMVENTION, NON-DISCLOSURE & WORKING AGREEMENT

ACCEPTED AND AGREED WITHOUT CHANGE

**PARTY No. 1 (One)**
**Designation: Supplier:**

Signed: _____          **Dated:** 9 May, 2005

**Full Name:** Dr. Stoyan I. Bakalov
**Title:** President
**Company Name:** Clover International Corporation

**Address:** 11430 Balls Ford Road, Manassas, VA 20109 USA
**Tel:** +1-703-330-1200  **Fax:** + 1-703-368-7543
**E-Mail:** clovercoal@aol.com
**Web Site:**

_____

**PARTY No. 2 (Two)**
**Designation: Agent**

Signed: _____          **Dated:** 9 May, 2005

**Full Name:** Paul F. Karshis
**Title:** President

**Company Name:** ABHA USA

**Address:** 76 Blackberry Rd, Boston, MA 02760, USA
**Tel:** +1-508-699-2416    **Cell:** +1-5080930-2124    **Fax:** +1-508-643-0466
**E-Mail:** paul.karshis@Abhausa.com
**Web Site:** www.Abhausa.com

_____

**END OF AGREEMENT**

Pg 3